2001 UT 22

**STATE of Utah, Plaintiff and Appellee,**

v.

**Jason Junior EVANS, Defendant
and Appellant.**

**No. 980181.**

Supreme Court of Utah.

March 9, 2001.

Mark Shurtleff, Att'y Gen., Kenneth A. Bronston, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Linda M. Jones, Salt Lake City, for defendant.

WILKINS, Justice:

¶ 1 Defendant appeals from convictions of two counts of attempted aggravated murder, first degree felonies in violation of section 76–5–202 of the Utah Code and one count of failure to respond to an officer's signal to stop, a third degree felony in violation of section 41–6–13.5 of the Utah Code. We affirm.

## BACKGROUND

¶ 2 We recite the facts in the light most favorable to the jury's verdict. *State v. Litherland,* 2000 UT 76, ¶ 2, 12 P.3d 92. On August 15, 1997, at approximately 10:40 p.m., West Valley City police officers Chad Evans and Cory Newbold were working undercover, patrolling in an unmarked car. They saw two cars driving together, a Monte Carlo, followed by a Pontiac. The keyhole on the driver's door of the Pontiac had been removed, and passengers in the Monte Carlo were passing around a bottle that appeared to be alcohol. Additionally, the officers discovered that the license plate on the Monte Carlo was not registered to that vehicle. The officers decided to pull the cars over, but because their car only had a siren and wig-wag headlights (lights that flash alternately), they called first for backup.

¶ 3 Officer Robert Idle, who was also working undercover, responded. Officer Idle's car had a siren, wig-wag headlights, and three sets of red and blue strobe lights, which were located inside the headlights, in the rear taillight housings, and attached to

the passenger visor. Officer Idle activated all of his emergency equipment, except his siren, to stop the two cars. He moved up behind the Pontiac, which started to pull over to the side of the road. As the Pontiac began to pull over, Officer Idle remained behind the Monte Carlo, and Officers Evans and Newbold pulled over behind the Pontiac. The Monte Carlo also pulled over, and Officer Idle parked about ten to twelve feet behind it. The Pontiac was behind Officer Idle's car, with Officers Newbold and Evans' car behind it. Officers Newbold and Evans' wig-wag lights and siren were engaged at the time.

¶ 4 Officer Idle got out of his car and began walking towards the Monte Carlo. Because he was working undercover, he was not in uniform, but was wearing shorts and a tee shirt, with his gun and badge attached to his belt. As soon as he started walking towards the Monte Carlo, he lifted up his tee shirt, making both his gun and badge visible. After he had taken about three steps, the driver's side door of the Monte Carlo opened, and defendant emerged holding a rifle. Defendant immediately began firing at Officer Idle. Officer Idle returned fire, and fell to the ground, continuing to fire until his weapon was empty.

¶ 5 Officer Evans, who was by then standing on an embankment alongside the road, saw Officer Idle drop to the ground and started running towards him. At the same time, defendant started to fire in the direction of Officer Evans. When Officer Evans reached Officer Idle, Officer Idle was in convulsions, having been shot several times.

¶ 6 During the gunfire, other vehicles were passing. At least two were hit by stray bullets. Bullets hit the front tire and windshield of one witness's car, causing the windshield to shatter, broken glass cutting the driver's shoulder. Another witness's car was hit from behind by a bullet that passed within eight to twelve inches of her seven-year-old daughter in the backseat and then hit the windshield directly in front of her eighteen-year-old daughter.

¶ 7 Officer Newbold, who was in his car trying to inform dispatch that shots had been fired, saw the Monte Carlo drive off. He followed with his siren and wig-wag lights on. Approximately four shots were fired from the Monte Carlo as it was driving away. As Officer Newbold continued to pursue, the Monte Carlo slowed to a stop. Defendant pointed the rifle out of the driver's window at Officer Newbold. Officer Newbold saw defendant pull the trigger and then try to either re-load the gun or clear a malfunction. No shots were fired, and the Monte Carlo took off again. Officer Newbold thought he saw two objects thrown out of the driver's side window.

¶ 8 Officer Newbold continued to chase the Monte Carlo, which did not stop until, in the course of attempting to evade police, it became damaged and disabled. By then, several other officers had arrived on the scene. Five people were removed from the Monte Carlo. Officer Newbold identified defendant as the driver. Defendant was arrested and charged with three counts of attempted aggravated murder and one count of failure to respond to an officer's signal.

¶ 9 At trial, three of the Monte Carlo passengers testified: Shiloh Griffin, Natasha Atwood, and Alepino Lavaka. Both Griffin and Atwood testified that they had been with defendant a week earlier when he acquired the gun he used that night. Lavaka said that defendant had shown him the gun the day before the shooting and told Lavaka that if he ever got pulled over, defendant was going to shoot because he did not want to go to prison. Atwood also testified to having a similar conversation with defendant, during which defendant told her that if he ever got pulled over "he would go out like a 'G,'" meaning gangster. When questioned about the initial police stop, Lavaka said that he saw red and blue lights in the rearview mirror, and Griffin testified that she thought she saw red and blue lights. Lavaka also testified that before defendant stopped the car, defendant said "we're getting pulled over."

¶ 10 The State also elicited testimony from four passing motorists, who testified that they saw a car being pulled over by an unmarked police car. Three of these witnesses testified that they knew that the car was being pulled over by police because they

saw red and blue police lights flashing on the police car. The fourth witness could not remember whether the police car had red and blue flashing lights; however, she testified that she recognized the car as a police car.

¶ 11 Defendant testified that he borrowed the gun because he wanted to go target shooting. Defendant denied telling Lavaka that if he was pulled over he would shoot. However, defendant recalled a conversation with Atwood during which he told her "if anybody ever tried to take me I'd go out like a 'G.' "

¶ 12 Defendant described the initial stop, shooting, and subsequent chase. Defendant testified that he pulled over because he saw "somebody flashing their brights at [him]." He said that he thought the driver of the Pontiac was trying to get his attention. Defendant said that when he got out of the car, he saw a stranger walking towards him with a gun in his belt. Defendant said that he responded by then reaching for the rifle, cocking it, and shooting. Defendant testified that he started to shoot because the individual coming towards him had his gun raised. After defendant realized that shots were being fired back at him, he got back into the car and drove off.

¶ 13 Defendant testified that he did not look back as he was driving away and did not know if anyone was following. He told Lavaka "if anybody's following us, shoot [them]." Lavaka refused, and defendant told him to take the wheel. Defendant said he then grabbed the gun off the floor and put it out the window. He tried to cock it, but it was empty. Lavaka threw the gun out of the passenger window. Defendant testified that he did not know he was being chased until he saw and heard patrol cars. He said that he had two large speakers in the back window of his car that blocked his view through the back window. He also testified that he did not know he had shot a police officer until he was arrested.

¶ 14 On appeal, defendant raises three claims of error: (1) the trial court committed plain error in failing to set out a unanimity requirement with respect to the theory relied upon to convict defendant of attempted aggravated murder; (2) the trial court erred in failing to instruct the jury on the lesser-included offense of attempted manslaughter; and (3) the trial court erred in failing to declare a mistrial after learning of the family relationship between a juror and the chief deputy in the prosecutor's office.

## ANALYSIS
### I. UNANIMITY INSTRUCTION

¶ 15 Defendant claims that his constitutional right to a unanimous verdict, under article I, section 10 of the Utah Constitution, was violated because the jury instructions concerning attempted aggravated murder set forth alternative theories on which the jury could convict defendant, but the instructions did not explain that the jury must be unanimous as to the theory relied upon for the conviction.[1] The instructions given to the jury were those requested by defendant.

---

1. For example, the instruction relating to the attempted aggravated murder of Robert Idle provided:

Before you can convict defendant of the crime of attempted aggravated murder, as charged in Count I of the Information, you must find from the following evidence, beyond a reasonable doubt, all of the following elements of that crime:
1. In Salt Lake County, on or about August 15, 1997, the defendant, Jason Evans:
2. Acting intentionally or knowingly;
3. Attempted to cause the death of Robert Idle;
4. Under either of the following circumstances:
(a) Jason Evans knowingly created a great risk of death to a person other than Robert Idle, Kory Newbold, Chad Evans, or himself;

or
(b) Robert Idle was a peace officer, and was either on duty or the attempted homicide is based on, is caused by, or is related to that official position, and Jason Evans knew, or reasonably should have known, that Robert Idle held that official position.

. . .

Defendant complains that the instruction did not explain to the jury that they had to unanimously agree on one of the aggravating circumstances listed in part four of the instruction.

The instruction relating to the attempted aggravated murder of Kory Newbold was substantially similar, the only difference being the aggravating circumstances.

¶ 16 Defendant neither objected to the absence of a specific instruction on jury unanimity, nor did he propose such an instruction. Because defendant did not object to the absence of a unanimity instruction, defendant relies on the doctrine of plain error in seeking review of the jury instructions. Under the plain error doctrine, defendant must demonstrate that failure to give an instruction on unanimity was not only error, but also that the error should have been obvious to the trial court, and that the error was of such a magnitude that there is a reasonable likelihood of a more favorable outcome for the defendant. *See State v. Saunders*, 1999 UT 59, ¶ 57, 992 P.2d 951.

¶ 17 A majority of this court has interpreted article I, section 10 to require jury unanimity with respect to each element of an aggravated murder charge. *See id.* at ¶¶ 59–62. At the time of defendant's trial in 1998, the issue was arguably unclear. *See State v. Tillman*, 750 P.2d 546 (Utah 1987) (containing four different opinions discussing jury unanimity). Nevertheless, in *Saunders*, a majority of this court explained that "three justices clearly indicated agreement on the fundamental proposition that unanimity was necessary as to all elements of an offense," and "[t]he only disagreement among those three was whether the instruction in that particular case in fact required less than unanimity as to the various elements of the offense." *Saunders*, 1999 UT 59 at ¶ 61, 992 P.2d 951. Even accepting the notion that failure to instruct the jury as to unanimity was an obvious error at the time of defendant's trial, we are not convinced that the instructions requested by defendant and given by the trial court, in this case, rise to the level of the "non-unanimity" instruction [2] at issue in *Saunders*. More importantly, we are unconvinced that the slight confusion that may have arisen from the wording of the instructions used here presents a reasonable likelihood of a more favorable result for defendant.

## II. ATTEMPTED MANSLAUGHTER INSTRUCTION

¶ 18 Defendant argues that the trial court erred in failing to instruct the jury on the lesser-included offense of attempted manslaughter for Count I, the attempted aggravated murder of Officer Idle. Under *State v. Baker*, 671 P.2d 152, 159 (Utah 1983), a defendant is entitled to a requested lesser-included offense instruction if (1) the two offenses are related because some of their statutory elements overlap, and the evidence at trial of the greater offense involves proof of some or all of those overlapping elements; and (2) the evidence provides a rational basis for a verdict acquitting the defendant of the offense charged and convicting the defendant of the lesser-included offense.

¶ 19 Defendant asserts that the first test of *Baker* was met in this case because the elements of attempted aggravated murder and attempted manslaughter overlapped in that both require proof of an attempted intentional killing. Defendant claims that the second requirement of *Baker* was also satisfied because defendant's testimony provided a rational basis for the jury to acquit him of attempted aggravated murder and convict him of attempted manslaughter. The evidence defendant put forth in support of this contention is that defendant did not see the emergency equipment (i.e. flashing lights) on Officer Idle's car, he did not know that Officer Idle was a police officer, and he grabbed his gun and began to fire only after he saw Officer Idle begin walking towards him with his gun raised.

¶ 20 We agree with defendant that the *Baker* requirements were satisfied and that the trial court erred in refusing to instruct the jury on the lesser-included offense of attempted manslaughter. However, we hold that this error was harmless. As we have previously explained, harmless error is an error that is sufficiently inconsequential that there is no reasonable likelihood that it affected the outcome of the proceedings. *State v. Robertson*, 932 P.2d 1219, 1227 (Utah

---

2. "[T]here is no requirement that the jurors be unanimous about precisely which act occurred or when or where the act or acts occurred. The only requirement is that each juror believe, be-

yond a reasonable doubt, that at least one prohibited act occurred [during the period set forth in the information]." *Saunders*, 1999 UT 59 at ¶ 65, 992 P.2d 951.

1997). Put differently, an error is harmful only if the likelihood of a different outcome is sufficiently high that it undermines our confidence in the verdict. *Id.*

¶ 21 In this case, the State offered testimony from several witnesses that contradicted defendant's sole testimony that he did not realize he had been pulled over by or had shot a police officer. First, Alepino Lavaka and Shiloh Griffin, passengers in defendant's car, testified that they knew they were being pulled over by police. Lavaka testified that before defendant stopped the car, defendant said, "Oh ... we're getting pulled over." Lavaka also said that he saw flashing red and blue lights reflected in the rearview mirror. Griffin said that she thought she saw red and blue flashing lights. The testimony of defendant's companions was consistent with the testimony of the police officers and passers-by also offered by the State to show that defendant had to have known that he was being pulled over by an officer. Officers Evans, Newbold and Idle all testified that the red and blue emergency lights and the wig-wag headlights on Officer Idle's car were engaged when Officer Idle pulled over defendant's car. Furthermore, three passing motorists also testified that they saw a car being pulled over by a police car with its red and blue lights flashing.

¶ 22 Only the testimony of defendant, that he was unaware that the driver of the car pursuing him was an officer, stands counter to this evidence. He offers no explanation as to how he saw Officer Idle, gun in hand, standing in front of the police car with its red and blue flashing lights, but failed to see the lights when looking carefully enough to see the gun in the officer's hand. Defendant's observation of Officer Idle, according to defendant's testimony, occurred prior to defendant reaching for his gun, cocking it, and firing. Additionally, for the jury to have accepted defendant's theory that he believed that he was being pursued by a sinister individual intent on harm without lawful motive, the jury would have also had to disbelieve or reconcile the contradictory testimony, of defendant's companions and their report of defendant's own statement that they were being "pulled over."

¶ 23 Defendant asks much of the jury. Given this evidence, our confidence in the jury's verdict for attempted aggravated murder is not undermined, and we conclude that it was harmless error for the trial court to fail to instruct the jury on the lesser-included offense of attempted manslaughter.

## III. FAILURE TO DECLARE MISTRIAL

¶ 24 On the fourth day of trial, the court learned that juror Hanseen failed to answer a voir dire question correctly. In a jury questionnaire, potential jurors were asked whether any family members or friends were employed by the county sheriff's office or the District Attorney's office, among other places. Hanseen answered that her husband was a volunteer in search and rescue for the sheriff's office, but she did not disclose the fact that her uncle by marriage was the chief deputy in the prosecutor's office. After this was discovered, defendant moved the trial court to declare a mistrial. The trial court interviewed Hanseen at length and denied defendant's motion.

¶ 25 This court has adopted the two-pronged test set forth in *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984), to determine when a juror's conduct entitles a party to a new trial. *See State v. Thomas,* 830 P.2d 243 (Utah 1992). Under the *McDonough* test, a party must show that the juror failed to answer honestly a material question on voir dire, and that a correct response would have provided a valid basis for a challenge for cause. 464 U.S. at 556, 104 S.Ct. 845. In this case, the trial court applied the *McDonough* test and concluded that the first part was satisfied because Hanseen, albeit inadvertently, had failed to disclose the fact that her uncle is an attorney in the prosecutor's office. However, the trial court found that the second part was not satisfied because, based on the interview with Hanseen, she would not have been stricken for cause had the relationship been discovered during voir dire.

¶ 26 The trial court's conclusion that the *McDonough* test was not satisfied is

a legal conclusion that we review for correctness, while the trial court's decision to deny defendant's motion for a new trial is reviewed under an abuse of discretion standard.

¶ 27 When the trial court learned of the relationship between Hanseen and the chief deputy in the prosecutor's office, it conducted, on the record, an extensive interview of Hanseen with counsel present. During this interview, Hanseen explained that she was related to the chief deputy by his marriage to her mother's sister. She said that she had lived with her aunt and uncle, the chief deputy, while she was a freshman in college, twenty-five years earlier. However, she now saw her uncle possibly every other year at family parties. Hanseen also said that she knew her uncle was an attorney, but she did not know whether he prosecuted or defended, nor did she ever talk to him about his work. She said that her involvement with her uncle was "very far removed." When questioned about her ability to be fair and impartial, Hanseen said that she felt "very strongly" that she could be fair to both sides in the case. The trial court also asked Hanseen if she would feel that she had to explain herself to either her aunt or her uncle if the jury in this case found the defendant not guilty. Hanseen replied, "Not at all.... I don't feel like I have that kind of relationship where I have to explain anything to them." Based on this interview, the trial court determined that Hanseen would not have been stricken for cause had she disclosed the relationship with her uncle during voir dire.

¶ 28 Under rule 18(e) of the Utah Rules of Criminal Procedure, a challenge for cause may be based on:

> (4) the existence of any social, legal, business, fiduciary or other relationship between the prospective juror and any party, witness or person alleged to have been victimized or injured by the defendant, *which relationship when viewed objectively, would suggest to reasonable minds that the prospective juror would be unable or unwilling to return a verdict which would be free of favoritism.*

Utah R.Crim. P. 18(e) (emphasis added). Here, the trial court correctly noted that under rule 18(e) the existence of a "familial relationship ... between a juror and a member of the ... District Attorney's office, in and of itself, ... is not necessarily the basis for a challenge for cause. There's got to be some more to it." The trial court determined that there was nothing to suggest that Hanseen could not return a verdict free of bias. The trial court found that Hanseen was "an independent person," who would be "capable of exercising careful and analytical analysis of the evidence in this case." The trial court concluded that had a challenge for cause been made during voir dire, it would have been denied. On this basis, the trial court concluded that the second prong of *McDonough* was not satisfied and denied defendant's motion for a mistrial. In doing so, the trial court correctly applied the law. As a result, the trial court was within the range of permitted discretion in denying defendant's motion for mistrial.

¶ 29 Defendant further argues that had he known of the relationship between Hanseen and the chief deputy, Hanseen would have been removed from the panel with a peremptory challenge. Although this may be true, defendant has failed to show how his inability to use a peremptory challenge to remove Hanseen resulted in prejudice. In *State v. Menzies*, 889 P.2d 393, 400 (Utah 1994), we held that the fact that the defendant had to use peremptory challenges to remove jurors that the trial court refused to remove for cause did not constitute grounds for reversal because defendant had not asserted that the jury that sat was partial or biased. The same reasoning applies in this case, and reversal is not appropriate when defendant has not shown that the jury that sat in his case was partial or biased.

¶ 30 Finally, defendant argues that in addition to committing error with regard to juror Hanseen, the trial court committed other errors related to the jury that this court should review on a cumulative basis to determine whether there is reversible error. However, defendant offers little analysis or argument in support of the cumulative errors he alleges, and he has failed to show that the jury in his case was not impartial or that the alleged

errors resulted in prejudice to defendant. Therefore, there is no basis for reversal.

¶ 31 Defendant's conviction is affirmed.

¶ 32 Chief Justice HOWE, Associate Chief Justice RUSSON, Justice DURHAM, and Justice DURRANT concur in Justice WILKINS' opinion.