*This opinion is subject to revision before final publication in the Pacific Reporter*

**2015 UT 45**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

THE STATE OF UTAH,
*Appellee,*

*v.*

CODY ALAN REECE,
*Appellant.*

No. 20120883
Filed April 14, 2015

Third District, West Jordan
The Honorable Bruce C. Lubeck
No. 101402231

Attorneys:

Lisa J. Remal, Tawni Hanseen, Brock Van De Kamp, Lori J. Steppi, Salt Lake City, for appellant

Sean D. Reyes, Att'y Gen., Christopher D. Ballard, Asst. Att'y Gen., for appellee

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which ASSOCIATE CHIEF JUSTICE LEE, JUSTICE DURHAM, JUSTICE PARRISH, and JUDGE ORME joined.

JUSTICE NEHRING did not participate herein due to his retirement; COURT OF APPEALS JUDGE GREGORY K. ORME sat.

JUSTICE DENO G. HIMONAS became a member of the Court on February 13, 2015, after oral argument in this matter, and accordingly did not participate.

CHIEF JUSTICE DURRANT, opinion of the Court:

## Introduction

¶1 Cody Reece was convicted of aggravated murder, aggravated burglary, possession of a weapon by a restricted person, and obstruction of justice. He argues that we must vacate his

convictions because the trial court erred by (1) denying his request for a variety of lesser-included-offense jury instructions, (2) preventing him from asking twelve questions during voir dire, (3) refusing to exclude evidence that he was arrested with a stolen rifle in his car one month after the murder, and (4) refusing to sever the weapons offense from the other charges.

¶2 We affirm Mr. Reece's convictions. First, although the court erred in denying Mr. Reece's request for lesser-included-offense instructions on several variants of unintentional homicide, the error was harmless due to the overwhelming evidence that Mr. Reece committed aggravated murder. Second, the court's limits on voir dire questioning were not improper—Mr. Reece was allowed to ask almost two hundred questions from his proposed juror questionnaire, and the court also permitted unlimited individual follow-up questioning with each prospective juror, so Mr. Reece had ample opportunity to evaluate each juror for potential biases. Third, the stolen-rifle evidence was properly admitted because it was relevant to the genuine noncharacter purpose of linking Mr. Reece to the murder weapon, and the evidence was unlikely to improperly affect the jurors' decision in light of the significant criminal conduct Mr. Reece admitted to in his trial testimony. Finally, the court's refusal to sever the weapons charge was not an abuse of discretion, because the jury never heard any evidence that Mr. Reece was a convicted felon.

¶3 Mr. Reece also challenges his sentence, arguing that the noncapital-aggravated-murder sentencing statute is unconstitutional. And even if it is not, he maintains that the court abused its discretion when it imposed a sentence of life without parole (LWOP) because it erroneously interpreted the sentencing statute as establishing a presumptive LWOP sentence. We conclude that the sentencing statute is constitutional for reasons we recently discussed in *State v. Perea*.[1] But because the record is unclear as to how the court's incorrect reading of the statute influenced its decision to impose an LWOP sentence, we remand for the court to determine whether its erroneous interpretation of the statute affected its sentencing decision. If the court concludes that it did, Mr. Reece is entitled to a new sentencing hearing.

---

[1] 2013 UT 68, 322 P.3d 624.

**Background**

¶4    The victim's husband returned home from work on the evening of July 13, 2010, to find his wife lying dead on the couch in their front room. She had a gunshot wound in her forehead and there was a bullet hole in the couch next to her body. The victim's face had been beaten with a hard object, and she had "deep gouges" on the back of her hands, most likely from attempting to shield her face during the attack. Police recovered a 9 mm shell casing, two slugs, and a broken piece of plastic, which they later matched with the guide rod used in a Beretta handgun. There was no sign of forced entry, no missing valuables, and no evidence of a struggle elsewhere in the home. Investigators determined that the victim was likely killed right where she was found on the couch by a bullet fired at a downward trajectory about one foot away from her head. Police never recovered the murder weapon.

¶5    That same evening, after several days of heavy drug use, Cody Reece drove to the victim's neighborhood in Sandy, Utah, to steal mail. Around 6:30 p.m., he took a brown package from a home located about one-half mile west of the victim's. Fifteen minutes later, witnesses saw Mr. Reece speeding through a construction site on 700 East in a black Mazda. Mr. Reece collided with another vehicle and drove off, eventually abandoning the Mazda in a neighborhood a mile north of the accident. He then walked through the neighborhood and knocked on several doors, asking for a glass of water and to use a phone. At one of the homes, he stole a money order out of the mailbox when the homeowner left the front door to retrieve a phone for Mr. Reece to use. He entered another home through the back door without permission, punched one of its occupants several times, and then fled through the front door. Eventually, several neighbors tackled Mr. Reece and restrained him until police arrived. Mr. Reece was arrested and jailed for assault and burglary.

¶6    Police began to suspect that Mr. Reece was involved in the victim's death, and three days after his arrest, they obtained a search warrant for his clothing. Investigators found a blood "stain on the bottom right-hand side" of Mr. Reece's shirt "as well as some droplets and a smear." There were also "two little droplets or spots" on the "back side of the shirt above the right shoulder." DNA testing revealed that the first stain contained a mixture of DNA from which neither Mr. Reece nor the victim could be excluded as contributors. The second stain matched the victim's DNA.

¶7 Police interviewed Mr. Reece on July 21, and he claimed that he could not remember much of what happened the day of the murder because he had been drinking heavily and using Xanax. He said he remembered getting into a car accident, running away because he thought his car had been hit intentionally, and being arrested. But he claimed not to remember entering any homes in the victim's neighborhood.

¶8 While in jail, Mr. Reece called his mother several times asking for help posting bail. When his mother asked him why he was in jail, he explained that his memory was "fuzzy," but he remembered things he could not talk about on the phone. According to Mr. Reece's cellmate (Cellmate), Mr. Reece told him that he entered the victim's home because as "he was driving by [the] house," he saw "the garage door open[]" and "didn't see any cars," so he believed no one was home. But once Mr. Reece was inside, "a lady came up and grabbed" him, "he grabbed his gun, turned around . . . and the gun went off by accident." Mr. Reece eventually posted bail and was released.

¶9 Once he was out of jail, Mr. Reece visited a friend (Friend) who, unbeknownst to Mr. Reece, was a paid confidential informant. She told investigators that Mr. Reece asked her for money and said he felt like he was going to go to prison for a long time if he did not get out of town. According to Friend, Mr. Reece said that he "probably shot a lady" and that he was having flashbacks of running through a restaurant with blood on his clothes and throwing his clothes and a gun into a dumpster. Friend also claimed that she was with Mr. Reece the day before the murder and saw him cleaning a 9 mm Beretta handgun.

¶10 Police arrested Mr. Reece again on August 10 based on a report that he was stealing license plates. They found a stolen assault rifle in his car, which they traced to a theft in Park City. According to the rifle's owner, the rifle and a 9 mm Beretta handgun were both in his truck the day the rifle was stolen in January 2010.

¶11 The State charged Mr. Reece with aggravated murder, aggravated burglary, possession of a dangerous weapon by a restricted person, and obstruction of justice. Over Mr. Reece's objection, the trial court granted the State's motion to introduce the stolen rifle as evidence linking him to a 9 mm Beretta handgun.

¶12 At trial, Mr. Reece denied telling Cellmate that he struggled with and accidentally shot the victim. He claimed that he did not have a gun on July 13 and said that Friend was lying about his incriminating statements and seeing him cleaning a 9 mm Beretta on

July 12. According to Mr. Reece, he was in the victim's neighborhood stealing mail when he heard a gunshot inside her home. He went inside to assist a woman he saw lying motionless in the living room, believing she may have tried to kill herself. He claimed that while he was leaning over her, he got some blood on his shirt, and he looked up to see a man with a gang tattoo holding a gun. Mr. Reece explained that he fled when the man turned the gun on him and that he purchased the stolen assault rifle for protection. He admitted that he had previously owned a 9 mm Beretta but insisted that he got rid of the gun in early 2010.

¶13 Mr. Reece requested that the court issue lesser-included-offense instructions on murder, felony murder, manslaughter, negligent homicide, and homicide by assault. The court denied the request, concluding that Mr. Reece's testimony "create[d] an all-or-nothing situation" and that there was no rational basis to believe Cellmate's testimony that the murder was inadvertent, in light of the physical evidence of an intentional killing. Mr. Reece also submitted a 193-question juror questionnaire. The court struck twelve questions and modified several others, citing concern for the jurors' privacy.

¶14 Mr. Reece moved to sever the weapons charge, which the court granted in part. The court instructed the jurors to determine whether Mr. Reece was in possession of a firearm on July 13 and informed them that it was unlawful under some circumstances for a person to purchase or possess a gun. The jury found Mr. Reece guilty of all charges and found that he possessed a weapon on July 13. Mr. Reece waived his right to a jury trial on the restricted person element of the weapons offense, and the court found that Mr. Reece was a convicted felon at the time he possessed a firearm.

¶15 Mr. Reece also filed a motion asserting that the aggravated murder sentencing statute was unconstitutional. The court rejected his claims and sentenced Mr. Reece to LWOP. He now appeals. We have jurisdiction under Utah Code section 78A-3-102(3)(i).

**Standard of Review**

¶16 Mr. Reece urges us to vacate his conviction and remand for a new trial. First, he argues that he was entitled to lesser-included-offense instructions on murder, felony murder, manslaughter, negligent homicide, and homicide by assault. "A trial court's refusal to grant a lesser included offense instruction is a question of law, which we review for correctness."[2] Second, he argues that the court

---

[2] *State v. Powell*, 2007 UT 9, ¶ 12, 154 P.3d 788.

inappropriately limited the scope of voir dire, inhibiting his ability "to question the prospective jurors about their biases related to substance abuse, association, employment, ties to the legal community and/or prosecutorial agencies, and upbringing." We review a judge's decision imposing limits on voir dire questioning for an abuse of discretion.[3]

¶17 Third, Mr. Reece contends that the trial court should have excluded evidence that police found a stolen assault rifle in Mr. Reece's car one month after the murder. "A trial court's admission of prior bad acts evidence is reviewed for abuse of discretion, but the evidence must be scrupulously examined by trial judges in the proper exercise of that discretion."[4] Fourth, Mr. Reece argues that the weapons offense should have been severed from the other charges because evidence that he unlawfully possessed a weapon "was not relevant" to the other charges "except to show a criminal disposition." "A ruling on a motion to sever charges" is discretionary "and will not be disturbed on appeal, absent an abuse of discretion."[5]

¶18 Finally, Mr. Reece argues in the alternative that we "should remand for a new sentencing hearing because (1) the noncapital aggravated murder sentencing statute is unconstitutional" and "(2) the court abused its discretion by sentencing Mr. Reece to" life without parole. The constitutionality of a statute is a question of law reviewed for correctness.[6] We review a trial court's sentencing decision for abuse of discretion.[7]

## Analysis

¶19 We affirm Mr. Reece's conviction. Even though the trial court erred in denying Mr. Reece's request for lesser-included-offense instructions, the error was harmless in light of uncontroverted physical evidence that linked Mr. Reece to the crime scene and demonstrated that the murder was intentional. The court did not abuse its discretion in imposing limits on voir dire

---

[3] *State v. Piansiaksone*, 954 P.2d 861, 867–68 (Utah 1998).

[4] *State v. Verde*, 2012 UT 60, ¶ 13, 296 P.3d 673 (internal quotation marks omitted).

[5] *State v. Saunders*, 699 P.2d 738, 740 (Utah 1985), *abrogated on other ground by State v. Doporto*, 935 P.2d 484, 489 (Utah 1997).

[6] *State v. MacGuire*, 2004 UT 4, ¶ 8, 84 P.3d 1171.

[7] *State v. Moa*, 2012 UT 28, ¶ 34, 282 P.3d 985.

questioning. Mr. Reece's attorney was allowed unlimited individual follow-up questions with each prospective juror and the totality of the lengthy juror questionnaire afforded him ample opportunity to unearth potential juror biases. The trial court did not abuse its discretion in admitting the stolen-rifle evidence, because the evidence was relevant to a genuine noncharacter purpose—whether Mr. Reece had access to the type of weapon investigators believed was used to kill the victim—and its admission was not unfairly prejudicial in light of the other evidence admitted at trial. Denying Mr. Reece's motion to sever the weapons charge was also not an abuse of discretion, because the court bifurcated the weapons charge in a way that prevented the jury from ever learning that Mr. Reece was a convicted felon.

¶20 We also conclude that the noncapital aggravated murder sentencing statute is constitutional for reasons we recently discussed in *State v. Perea*,[8] but we agree with Mr. Reece that the trial court incorrectly interpreted the statute as imposing a presumptive sentence of LWOP. We therefore remand to the trial court for a limited hearing to determine how this mistake influenced the court's sentencing decision. If the trial court determines that its mistaken interpretation of the statute impacted the ultimate decision to impose LWOP, Mr. Reece is entitled to a new sentencing hearing.

### I. Mr. Reece Was Entitled to Lesser-Included-Offense Instructions, but the Error Was Harmless

¶21 Mr. Reece argues that the trial court improperly denied his request for lesser-included-offense instructions on murder, felony murder, manslaughter, negligent homicide, and homicide by assault. Utah Code section 76-1-402 provides that trial courts "shall not be obligated to charge the jury with respect to an included offense unless there is a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense."[9] This court has interpreted section 76-1-402 to require a defendant to make two showings before he is entitled to a lesser-included-offense instruction: "(1) that the charged offense and the lesser included offense have overlapping statutory elements and (2) that the evidence provides a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included

---

[8] 2013 UT 68, ¶¶ 108–27, 322 P.3d 624.

[9] UTAH CODE § 76-1-402(4).

offense."[10] The State concedes, and we agree, that the statutory elements of aggravated murder overlap with each of Mr. Reece's proposed lesser included offenses. We also agree with Mr. Reece that Cellmate's testimony, considered in isolation, provides a rational basis in the evidence to acquit him of aggravated murder and convict him of lesser included offenses that punish unintentional killings. But errors in criminal proceedings usually justify reversal only if there is a reasonable likelihood that the error affected the outcome of the proceedings.[11] And in light of the uncontroverted physical evidence linking Mr. Reece to the crime scene and showing overwhelmingly that he killed the victim intentionally, we conclude that the error was harmless.

### A. There is a Rational Basis in the Evidence to Acquit Mr. Reece of Aggravated Murder and Convict Him of Lesser Included Offenses Involving Unintentional Killings

¶22 Even if the statutory elements of a lesser included offense overlap with those of the charged offense, "a defendant's right to a lesser included offense instruction is limited by the evidence and only justified where there is a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense."[12] In making that determination, trial courts must "view[] the evidence in the light most favorable to the defendant" and cannot "weigh the evidence."[13] Rather, "when the evidence is ambiguous and therefore susceptible to alternative interpretations, and one alternative would permit acquittal of the greater offense and conviction of the lesser, a jury question exists and the court must give a lesser included offense instruction at the request of the defendant."[14] This standard assures that lesser-included-offense instructions serve their intended purpose of safeguarding a

---

[10] *State v. Powell*, 2007 UT 9, ¶ 24, 154 P.3d 788 (internal quotation marks omitted).

[11] *See State v. Vargas*, 2001 UT 5, ¶ 48, 20 P.3d 271 ("Even assuming the trial court erred in concluding there was good cause for allowing the State to obtain the defense witness list, we will not reverse [the] trial court for committing harmless error." (alteration in original) (internal quotation marks omitted)).

[12] *Powell*, 2007 UT 9, ¶ 27 (internal quotation marks omitted).

[13] *Id.*

[14] *State v. Baker*, 671 P.2d 152, 159 (Utah 1983).

defendant's constitutional right to a fair trial[15] without "allow[ing] the jury to return a compromise, or other unwarranted verdict."[16] We conclude that the trial court properly denied Mr. Reece's request for a lesser-included-offense instruction on murder, but because there was a rational basis in the evidence for the jury to conclude that the killing was unintentional, the court erred in denying Mr. Reece's request for an instruction on the other lesser included offenses that punish unintentional killings.

1. There was no rational basis in the evidence to justify a jury instruction on murder

¶23 As we have discussed, Mr. Reece is not entitled to a lesser-included-offense instruction on murder unless there is a rational basis to convict him of that offense and acquit him of aggravated murder. Aggravated murder occurs when a person "intentionally or knowingly causes the death of another . . . incident to" the commission of a listed felony.[17] And in this case, the State charged Mr. Reece with killing the victim during the course of a burglary, which is one of the felonies listed in the aggravated murder statute. Mr. Reece argues that "there was evidence to support a verdict of murder because there was a rational basis to find that [he] did not commit burglary," but intentionally or knowingly killed the victim. He points out that "[n]othing was stolen or disturbed in the home" and that he "was extremely intoxicated and suffering paranoia, anxiety, and memory loss" at the time. He also cites evidence in the record that "he approached other homes" in the victim's neighborhood "for purposes other than theft or assault—e.g., he entered one home looking for 'Mike' and approached others looking for a telephone or glass of water." The State maintains that "[e]ven if the jury might have believed that [Mr. Reece] innocently entered [the victim's] home, once it found that he committed an intentional homicide there, it would also necessarily find that he" committed a burglary and aggravated murder. We agree with the State.

¶24 No rational jury could have concluded that Mr. Reece committed murder without also concluding that he committed a burglary. Burglary occurs when a defendant "enters or remains unlawfully in a building or any portion of a building with intent to

---

[15] *See id.* at 157.

[16] *Powell*, 2007 UT 9, ¶ 27 (internal quotation marks omitted).

[17] UTAH CODE § 76-5-202(1)(d).

commit: (a) a felony; (b) theft; [or] (c) an assault on any person."[18] In other words, a person can commit burglary without stealing anything—a person who commits any felony while remaining unlawfully inside a building is also guilty of burglary. And we have previously concluded that a defendant can "form the intent to commit another crime at the time he enters or while he remains *unlawfully* in [a] building."[19] Accordingly, in *State v. Tillman*, we determined that a defendant who broke into the victim's home for the purpose of killing him had committed "first degree murder,"[20] an offense Utah law now punishes as aggravated murder.[21] We rejected the contention that "since burglary is a completed offense the moment entry is made with the requisite felonious intent, such circumstance . . . could not provide the basis for elevating the subsequent intentional killing to first degree murder."[22] Instead, we determined that because the defendant "committed an intentional homicide" after unlawfully entering the victim's home, the evidence "clearly supported" a conclusion that the defendant committed a burglary and elevated the killing from murder to first degree murder.[23]

¶25 Here, Mr. Reece is correct that there is no evidence that he took anything from the victim's home. A crime scene investigator testified that "[t]he house was extremely clean" and that "nothing [was] out of order." The victim's husband also testified that, to the best of his knowledge, nothing was missing from his home after the murder. And Mr. Reece also testified that he entered the home lawfully "to help" a woman he saw through the window "lying flat" after he heard a gunshot. But even if the jury believed that Mr. Reece's initial entry was a lawful attempt to aid someone in distress, Mr. Reece's presence in the home became unlawful the moment he decided to "intentionally or knowingly" kill the victim.[24] If the jurors

---

[18] UTAH CODE § 76-6-202(1).

[19] *State v. Rudolph*, 970 P.2d 1221, 1229 (Utah 1998).

[20] 750 P.2d 546, 551, 571–72 (Utah 1987).

[21] *See* UTAH CODE § 76-5-202(1)(d); *Tillman*, 750 P.2d at 550, 568–69.

[22] *Tillman*, 750 P.2d at 571 (internal quotation marks omitted).

[23] *Id.* at 572.

[24] *See* UTAH CODE § 76-6-202(1)(a) (providing that a person commits burglary by "enter[ing] or remain[ing] unlawfully in a building or any portion of a building with intent to commit . . . a

believed that Mr. Reece committed murder while "remain[ing] unlawfully" in the victim's home, they would have no choice but to convict him of burglary as well, even though he did not steal anything. And if Mr. Reece "intentionally or knowingly" caused the victim's death "incident to . . . a burglary," no reasonable juror could conclude that Mr. Reece committed murder without also determining that the killing amounted to aggravated murder.[25] We therefore conclude that the trial court properly denied Mr. Reece's request for a lesser-included-offense instruction on murder.

2. There was a rational basis in the evidence to justify jury instructions on several variants of unintentional homicide

¶26 But we cannot agree with the trial court's conclusion that there was no rational basis in the evidence to justify instructions on the other lesser included offenses Mr. Reece requested. Mr. Reece asked the court for instructions on several other offenses, all of which punish unintentional killings.[26] The only evidence of an accidental murder was Cellmate's account of his jailhouse conversation with Mr. Reece. According to Cellmate, Mr. Reece told him that he "walked in" to the victim's home and "a lady came up and grabbed him, and he grabbed his gun, turned around . . . and the gun went off by accident."

¶27 The trial court acknowledged that Cellmate's testimony, standing alone, "would have justified lesser instructions." But the court denied the requested instructions because Mr. Reece testified that Cellmate was lying—he claimed that he "[n]ever told" Cellmate "that there was a lady inside the house . . . that startled" him or "that somewhere in the process of interacting with this lady . . . the gun went off." The court also noted that Cellmate's testimony was inconsistent with the physical evidence. A crime scene investigator testified that there were "no drag marks, no smear marks . . . in the

---

felony"); *id.* § 76-5-203(2)(a) (defining murder as "intentionally or knowingly caus[ing] the death of another").

[25] *Id.* § 76-5-202(1)(d) (defining aggravated murder as "intentionally or knowingly" causing a death "incident to . . . aggravated burglary[ or] burglary").

[26] Mr. Reece argues in his reply brief that a depraved-indifference-murder instruction would have been appropriate, and he asked the trial court for instructions on felony murder, manslaughter, negligent homicide, and homicide by assault.

blood that we could see. No blood anywhere else [was] found. All the blood was concentrated in that one area right on the love seat" where investigators found the victim's body. The investigator also testified that the victim's gunshot wound was consistent with a bullet fired at a "downward trajectory" about one foot away from her head. And a weapons expert testified that the gun likely used to kill the victim can be discharged only if "the trigger is pulled . . . to 90 percent engagement," making it highly unlikely that this "type of gun . . . may accidentally go off."

¶28 The State argues that Cellmate's "testimony cannot support a lesser included offense instruction because" Mr. Reece "took the stand and repudiated it." According to the State, our obligation to "view[] the evidence in the light most favorable to the defendant requesting the instruction"[27] requires us "to take Mr. Reece at his word and discount [Cellmate's] testimony." Additionally, the State maintains that Cellmate's testimony, standing alone, provides no basis for reasonable jurors to ignore the "uncontradicted physical evidence demonstrat[ing] that the shooting was intentional." We disagree.

¶29 The "light most favorable standard" serves several important functions, including preserving the jury's "responsibility of evaluating the weight and credibility of the evidence."[28] Indeed, in determining whether there is a rational basis in the evidence to support a lesser-included-offense instruction, a trial court may not "weigh the credibility of the evidence."[29] Rather, "when the evidence is ambiguous and therefore susceptible to alternative interpretations, and one alternative would permit acquittal of the greater offense and conviction of the lesser, a jury question exists and the court must give a lesser included offense instruction at the request of the defendant."[30] Consequently, instead of ignoring Cellmate's testimony and confining our analysis to evidence that supports the specific defense theory Mr. Reece presented at trial, we examine the entire "record taken as a whole,"[31] accepting whatever portions of

---

[27] *Powell*, 2007 UT 9, ¶ 27.

[28] *Id.*

[29] *Baker*, 671 P.2d at 159.

[30] *Id.*

[31] *See Powell*, 2007 UT 9, ¶ 27.

witness testimony, as well as other evidence, that support the requested lesser-included-offense instruction.[32]

¶30 There may be some cases where this "process of dissect[ing] and reconstruct[ing]" the evidence fails to reveal a rational basis in the evidence for a lesser-included-offense instruction despite some supporting evidence.[33] For instance, although trial courts must construe the facts and all reasonable inferences from them in favor of the defendant, an inference is not reasonable if "it falls to a level of inconsistency or incredibility that no reasonable jury could accept it."[34] In other words, a "defendant's request for a lesser included offense instruction" cannot be "based on sheer speculation"[35] from a discrete piece of evidence if, viewed in the context of the record as a whole, acquitting the defendant of the greater offense and convicting of the lesser would require jurors to fill gaps in the evidentiary picture with their own speculative judgments.[36] For instance, in *State v. Kell*, we concluded that the defendant was not entitled to an

---

[32] *Cf. Baldwin v. Vantage Corp.*, 676 P.2d 413, 417 (Utah 1984) (noting that "the testimony of witnesses is to be given such weight and credibility as the trier of fact may find reasonable under the circumstances").

[33] *See United States v. Moore*, 108 F.3d 270, 273 (10th Cir. 1997).

[34] *State v. Maughan*, 2013 UT 37, ¶ 14, 305 P.3d 1058 (internal quotation marks omitted).

[35] *Powell*, 2007 UT 9, ¶ 33.

[36] *See, e.g., State v. Garcia-Vargas*, 2012 UT App 270, ¶ 17, 287 P.3d 474 (denying a request for a lesser-included-offense instruction where even though the defendant's testimony raised "at least the possibility" that he committed the lesser offense but not the greater, that conclusion was "entirely speculative" based on other evidence in the case); *Moore*, 108 F.3d at 273 ("While it is sometimes permissible for the jury to dissect and reconstruct the evidence to identify a rational basis upon which to convict on the lesser and acquit on the greater offense, the process of dissection and reconstruction must itself be rationally motivated." (footnote omitted)); *United States v. Crowder*, 543 F.2d 312, 318 (D.C. Cir. 1976) (rejecting a request for a self-defense instruction because "[t]he theory fragments the testimony in a selective process . . . so attenuated as to strain credulity to the breaking point" (internal quotation marks omitted)).

instruction on imperfect self-defense manslaughter, even though he "testified that he believed he was acting out of self-defense" when he killed the victim.[37] We noted that because the defendant stabbed the victim multiple times in the back while the victim was both unarmed and handcuffed, the "great weight of the evidence" contradicted the defendant's claim and strongly indicated that the defendant "could not have believed himself to be in imminent danger at the time of the attack."[38]

¶31 But here, unlike the evidence presented in *Kell*, Cellmate's testimony could have supported an inference that the murder was unintentional without requiring the jurors to engage in speculation. Viewing the evidence in the light most favorable to Mr. Reece, we must assume that he perjured himself at trial when he testified that he did not have a gun the day of the murder and that someone else killed the victim. And we must also assume that Mr. Reece was being truthful when he told Cellmate that his gun went off inadvertently during a brief struggle with the victim. Reaching these conclusions would not require a reasonable juror to ignore the physical evidence; rather, the jurors could have simply believed that the location of the victim's blood and the trajectory of the bullet demonstrated that Mr. Reece discovered the victim in her living room, struggled with her near the couch, and accidentally shot her when she reached for his gun. Such a scenario would be consistent with the victim's husband's description of her as someone who "wouldn't back down" and would have tried to fight off her attacker. The State's experts, of course, interpreted the evidence differently, but the jurors can assign expert "testimony any weight they choose, including no weight at all."[39] We therefore conclude that there was "a sufficient quantum of evidence to raise a jury question"[40] about whether Mr. Reece shot the victim inadvertently, and the court therefore erred by concluding that there was no rational basis for lesser-included-offense instructions involving an unintentional killing.

---

[37] 2002 UT 106, ¶ 25, 61 P.3d 1019.

[38] *Id.*

[39] *Dixon v. Stewart*, 658 P.2d 591, 597 (Utah 1982) ("No matter how arcane the subject matter or how erudite the witness, the jury is not required to accept the expert's testimony as conclusive.").

[40] *Baker*, 671 P.2d at 159.

### B. *Failing to Issue Lesser-Included-Offense Instructions Was Harmless Error*

¶32   Having concluded that Mr. Reece was entitled to a lesser-included-offense instruction, we now turn to the question of whether the trial court's error prejudiced his case. We begin by clarifying an ambiguity in our caselaw—whether the improper denial of a lesser-included-offense instruction presumptively affects the outcome of a case and precludes any harmless error analysis. We conclude that denying a lesser-included-offense instruction is an ordinary trial error to which harmless error analysis applies. We also conclude that the trial court's error in denying Mr. Reece's requested instructions was harmless in light of the overwhelming evidence linking him to the crime scene and demonstrating that the murder was intentional.

1.   Failing to instruct the jury on a lesser included offense is not a structural error

¶33   An error is harmless and does not require reversal if it is "sufficiently inconsequential that we conclude there is no reasonable likelihood that the error affected the outcome of the proceedings."[41] Stated differently, "the likelihood of a different outcome" absent the error "must be sufficiently high to undermine confidence in the verdict."[42]   Errors are often harmless where there is overwhelming evidence in the record of the defendant's guilt.[43] And the defendant generally bears the burden to demonstrate that the error he complains of affected the outcome of his case.[44]

---

[41] *State v. Verde*, 770 P.2d 116, 120 (Utah 1989).

[42]   *State v. Hamilton*, 827 P.2d 232, 240 (Utah 1992) (internal quotation marks omitted).

[43]   *See, e.g., State v. Maestas*, 2012 UT 46, ¶ 165, 299 P.3d 892 (concluding that a prosecutor's inappropriate reference during closing argument to the fact that the defendant did not testify was harmless because "the jury was given a strong curative instruction and there was overwhelming evidence" of the defendant's guilt); *State v. Young*, 853 P.2d 327, 345 (Utah 1993) (concluding that even if "the trial court erred in admitting evidence of [the defendant's] attempted flight from the police," the error was harmless "[i]n light of the overwhelming evidence of defendant's guilt").

[44]   *See State v. Bell*, 770 P.2d 100, 106 (Utah 1988); *see also* UTAH R. CRIM. P. 30(a) ("Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded.").

¶34 But there is a narrow exception to this general rule. We have recognized that "structural errors" that affect "the framework within which the trial proceeds" are qualitatively different than an ordinary "error in the trial process itself."[45] Consequently, we presume that a structural error affected the outcome of the case and do not require the defendant to show prejudice.[46] Examples of such errors include mistakes in reasonable doubt instructions,[47] the complete denial of counsel at a critical stage of a criminal proceeding,[48] racial discrimination in jury selection,[49] lack of an impartial trial judge,[50] denial of the right to a public trial,[51] and the failure to instruct the jury on "the basic elements of an offense."[52]

¶35 Citing our decision in *State v. Spillers*,[53] Mr. Reece argues that when a trial court fails to give a lesser-included-offense instruction, "[p]rejudice . . . is not measured by the strength of the evidence but by whether the evidence is consistent with both the defendant's and the State's theory of the case." In other words, Mr. Reece contends that as long as there is a rational basis in the evidence to support instructing the jury on a lesser included offense,

---

[45] *State v. Cruz*, 2005 UT 45, ¶ 17, 122 P.3d 543 (internal quotation marks omitted).

[46] *Id.*

[47] *Id.* ¶¶ 17–18.

[48] *Gideon v. Wainwright*, 372 U.S. 335, 339, 342–45 (1963); *see also Maestas*, 2012 UT 46, ¶ 57.

[49] *Batson v. Kentucky*, 476 U.S. 79, 100 (1986); *State v. Higginbotham*, 917 P.2d 545, 547–48 (Utah 1996). *But see State v. Harris*, 2012 UT 77, ¶ 30 n.13, 289 P.3d 591 ("Harris also urges us to adopt the view that *Batson* errors are structural in nature and therefore obviate the prejudice inquiry under the plain error standard. Because we conclude that any error here could not have been obvious to the trial court, however, we need not and accordingly do not reach the prejudice question of the 'structural error' ground for avoiding proof of prejudice.").

[50] *Kell*, 2002 UT 106, ¶ 15 n.2 (citing *Johnson v. United States*, 520 U.S. 461, 468–69 (1997)).

[51] *Id.* ¶ 15.

[52] *State v. Bluff*, 2002 UT 66, ¶ 26, 52 P.3d 1210 (internal quotation marks omitted).

[53] *State v. Spillers*, 2007 UT 13, ¶ 24, 152 P.3d 315.

a trial court's failure to instruct the jury presumptively affects the outcome of trial and is not subject to our typical harmless error analysis on appeal.

¶36 We reject Mr. Reece's contention for two reasons. First, although Mr. Reece cites language in two cases that seems to support his position, this court has never held that failing to instruct the jury on a lesser included offense is a structural error. Second, the failure to instruct the jury on a lesser included offense bears a close resemblance to other ordinary trial errors we review for harmlessness.

¶37 Mr. Reece cites *State v. Spillers* to support his assertion that the failure to give a lesser-included-offense instruction is a structural error. In that case, we held that a defendant convicted of first degree murder was entitled to an instruction on extreme emotional distress manslaughter.[54] And we cited a Utah Court of Appeals case for the proposition that "'failing to instruct on [a] lesser included offense presumptively affects the outcome of the trial'" when "'the evidence is consistent with both the defendant's and the State's theory of the case.'"[55] That statement, standing alone, has an air of structural error about it. But in *Spillers*, we devoted just one paragraph to harmless error analysis and did not attempt to distinguish, nor purport to overrule, other decisions that found harmless error in this context.[56] And the court of appeals decision we cited in *Spillers* did not engage the issue in any more depth or attempt to distinguish other court of appeals precedent that applied traditional harmless error review.[57]

¶38 Furthermore, a survey of our own caselaw and our court of appeals decisions reveals that both courts have consistently applied harmless error analysis to a trial court's erroneous denial of lesser-included-offense instructions. In *State v. Evans*, for example, we concluded that "the trial court erred in refusing to instruct the jury on the lesser-included offense of attempted manslaughter."[58] But we explained that the error was harmless because the only evidence

---

[54] *Id.* ¶¶ 9, 20.

[55] *Id.* ¶ 24 (quoting *State v. Knight*, 2003 UT App 354, ¶ 17, 79 P.3d 969).

[56] *Id.*

[57] *See Knight*, 2003 UT App 354, ¶ 17.

[58] 2001 UT 22, ¶ 20, 20 P.3d 888.

supporting the instruction was the defendant's own self-serving testimony, which conflicted with the accounts of numerous eyewitnesses.[59] Similarly, in *State v. Payne*, the court of appeals concluded that there was "a rational basis for a verdict acquitting [the defendant] of lewdness involving a child and convicting him of the lesser included offense of child abuse,"[60] but it determined that the error was harmless.[61] There the court observed that to convict the defendant of the lesser offense and acquit him of the greater, "the jury would have to reject the credibility of [several] witnesses in favor of mere inferences that are conceivable from the evidence but are by no means compelled by it."[62] These cases are not outliers—Utah courts have consistently applied harmless error analysis in this context for at least three decades.[63]

¶39 Not only has our caselaw never classified the failure to issue a lesser-included-offense instruction as a structural error, but this type of error also closely resembles others that we have always reviewed for harmlessness. For example, errors in jury instructions are routinely reviewed for harmless error,[64] including instructions that mischaracterize the culpable mental state required to sustain a

---

[59] *Id.* ¶¶ 21–23.

[60] 964 P.2d 327, 334 (Utah Ct. App. 1998).

[61] *Id.* at 335

[62] *Id.*

[63] *See, e.g.*, *State v. Daniels*, 2002 UT 2, ¶ 29, 40 P.3d 611; *State v. Piansiaksone*, 954 P.2d 861, 871–72 (Utah 1998); *State v. Pearson*, 943 P.2d 1347, 1350–51 (Utah 1997); *State v. Gotschall*, 782 P.2d 459, 464 (Utah 1989), *abrogated on other grounds by State v. Doporto*, 935 P.2d 484, 489 (Utah 1997).

[64] *See, e.g.*, *Piansiaksone*, 954 P.2d at 870–71 (concluding that jury instructions that "improperly mandated an order of deliberation and deprived defendant of the right to have the jury consider his 'defense' of manslaughter" were harmless errors); *State v. Fontana*, 680 P.2d 1042, 1048–49 (Utah 1984) ("Even if the instruction on depraved indifference second degree murder had been in error, the error was not prejudicial."); *State v. Montague*, 671 P.2d 187, 190 (Utah 1983) ("[A] criminal conviction is not reversed because of an erroneous jury instruction unless the error is of such gravity that it could cause substantial prejudice to defendant's rights.").

conviction.[65] Similarly, we have applied harmless-error review to erroneous self-defense instructions[66] and the complete failure to instruct the jury on an affirmative defense.[67] The analogy to affirmative defense instructions is particularly apt because defendants are entitled to such instructions if the evidence "provides any reasonable basis upon which a jury could conclude that the affirmative defense applies to the defendant,"[68] a standard that mirrors the rational basis test for lesser-included-offense instructions.[69] In reviewing these errors for harmlessness, we have treated them as "garden-variety trial errors" rather than fundamental flaws that "affect the very framework of the trial" itself.[70] And beyond citing our statement in *Spillers*, Mr. Reece has not identified any reason why the failure to give lesser-included-offense instructions should be treated any differently. Accordingly, we conclude that the failure to give a lesser-included-offense instruction is not a structural error. To the extent language in *Spillers* or *Knight* could be read to the contrary, we disavow it.

2. The trial court's failure to instruct the jury in Mr. Reece's case was harmless error

¶40 We now turn to the question of whether the trial court's erroneous denial of Mr. Reece's requested lesser-included-offense instructions "affected the outcome of the proceedings."[71] The trial

---

[65] *Powell*, 2007 UT 9, ¶¶ 19, 21–23 (holding that a jury instruction that erroneously stated that the mens rea requirement for attempted murder was "knowing" or "depraved indifference" was harmless error because "the uncontested evidence would allow the jury only one reasonable conclusion: that [the defendant] intentionally attempted to cause [the victim's] death").

[66] *State v. Starks*, 627 P.2d 88, 91–92 (Utah 1981).

[67] *See State v. Cowan*, 490 P.2d 890, 892 (Utah 1971) (concluding that failing to give an entrapment instruction was harmless error); *State v. Cox*, 751 P.2d 1152, 1154–55 (Utah Ct. App. 1988) (holding that the failure to instruct the jury on a defense of implied consent in an unlawful control of a vehicle was harmless error).

[68] *State v. Low*, 2008 UT 58, ¶ 25, 192 P.3d 867.

[69] *See supra* ¶ 22.

[70] *See Cruz*, 2005 UT 45, ¶ 17.

[71] *State v. Evans*, 2001 UT 22, ¶ 20, 20 P.3d 888.

court's error is not harmful unless there is a reasonable likelihood that the jury would have acquitted Mr. Reece of aggravated murder and convicted him of an offense involving an unintentional killing.[72] Because there was overwhelming evidence that Mr. Reece intentionally killed the victim, we conclude that "there is no reasonable likelihood" that the jury would have acquitted Mr. Reece of aggravated murder. Accordingly, our confidence in the verdict is not undermined,[73] and denying the requested instructions was therefore harmless error.

¶41 First, the physical evidence conclusively linked Mr. Reece to the crime scene—investigators found the victim's blood on Mr. Reece's shirt, he admitted that he entered the victim's home, and his attempt at providing an innocent explanation for this incriminating evidence was, to put it mildly, implausible. In his telling, Mr. Reece was a good Samaritan that stumbled into the wrong place at the wrong time. He claims that he heard a gunshot, looked into the victim's home, and saw a woman "lying flat"—a woman he believed had just tried to kill herself. He then rushed inside to assist the woman and got blood on his shirt while leaning over her. But Mr. Reece also admitted that he was only near the victim's home because he thought it was in "a nice neighborhood and [he] was going to check mailboxes in that neighborhood" to "see if [he] could get anything valuable." On the night of the murder, the evidence also showed that Mr. Reece entered three homes without permission, violently assaulted one resident, and stole a package and a money order from two other homeowners in the area. Essentially, Mr. Reece asked the jury to believe that sometime during a crime spree that spanned two hours and in which he committed multiple felonies, he felt compelled to stop at the victim's home just to be a good citizen. We find his story to be simply incredible.

¶42 Second, the evidence of an intentional murder overwhelmed Cellmate's testimony that Mr. Reece accidentally shot the victim during a brief struggle. According to investigators, all of the victim's blood "was concentrated in . . . one area right on the love seat" where they found her body, and the bullet that killed her was fired at a "downward trajectory" about one foot away from her head. The victim had a black eye, cuts on her nose, loose teeth, and abrasions on the side of her face "consistent with [a] blunt force injury." The state medical examiner believed that the victim "was struck by

---

[72] *See id.*

[73] *Id.*

something that was very hard with a lot of force." These injuries, along with cuts on the back of the victim's left hand, led the medical examiner to conclude that the victim tried "to cover [her] face with a hand while she [was] being struck." A weapons expert also testified that the gun likely used to kill the victim can be discharged only if "the trigger is pulled . . . to 90 percent engagement," making it highly unlikely that this "type of gun . . . may accidentally go off." And of course, Mr. Reece testified that Cellmate was lying, repudiating the only piece of evidence that the murder was accidental.

¶43 The physical evidence and the inherent implausibility of Mr. Reece's testimony lead us to conclude that there was overwhelming evidence that he killed the victim intentionally during the course of a burglary. We therefore conclude that even if the trial court had instructed the jury on lesser offenses involving unintentional killings, "there is no reasonable likelihood" that the outcome of trial would have been any different, and the trial court's failure to issue the instructions was harmless.[74]

## II. The Trial Court Appropriately Limited Voir Dire

¶44 Mr. Reece next argues that the trial court "erred in refusing to allow [him] to ask" prospective jurors questions he claims would have allowed him to detect biases unfavorable to his case. Mr. Reece submitted a proposed juror questionnaire with 193 questions. The trial court refused to ask only twelve of them and modified a few others. According to Mr. Reece, these limits "substantially impaired" his ability to "intelligently exercise his peremptory challenges." The State maintains that the totality of the questions asked and the opportunity Mr. Reece had for individual follow-up questioning with each prospective juror "afforded Mr. Reece an adequate opportunity to gain the information necessary to evaluate the jurors." We agree with the State.

¶45 The purpose of voir dire examination is "both the detection of actual bias . . . and the collection of data to permit informed exercise of the peremptory challenge."[75] Generally, "trial courts should be permissive in allowing voir dire questions and should exercise their discretion in favor of allowing counsel to elicit

---

[74] *See id.*

[75] *State v. Piansiaksone*, 954 P.2d 861, 867 (Utah 1998) (alteration in original) (internal quotation marks omitted).

information from prospective jurors."[76] But trial courts have no obligation "to permit *every* question" that "might disclose some basis for counsel to favor or disfavor seating a particular juror."[77] Nor do defendants have a right "to ask questions in a particular manner."[78] Rather, courts have broad discretion to limit any question that bears only a tangential relationship to jurors' potential biases or that "unduly intrudes" into the jurors' private lives.[79] A court's limits on voir dire questioning are not an abuse of discretion when, "considering the totality of the questioning, counsel was afforded an adequate opportunity to gain the information necessary to evaluate the jurors."[80]

¶46 Mr. Reece identifies five areas of concern that the court prevented him from exploring effectively: (1) "bias towards the prosecution and . . . law enforcement," (2) "jurors' possible upbringing and attitudes toward the criminal justice system," (3) attitudes derived from membership in "social organizations," (4) "whether jurors would have been unsuitable for the defense based on their connection to people employed in the legal community," and (5) "any negative assumptions about persons who have substance abuse problems." The totality of the questionnaire and Mr. Reece's follow-up questions adequately covered each of these topics, and the trial court acted well within its discretion by limiting or excluding questions that it determined probed too deeply into the jurors' private lives.

¶47 First, with respect to jurors' "biases towards . . . law enforcement" and "attitudes toward the criminal justice system," Mr. Reece complains that the court did not allow him to ask a number of questions about the jurors' relationship with law enforcement or security companies. In particular, Mr. Reece wanted to ask each juror about specific positions he or she had held with a law enforcement agency or a private security firm, whether a spouse

---

[76] *Id.* at 868.

[77] *Id.*

[78] *Taylor v. State*, 2007 UT 12, ¶ 70, 156 P.3d 739 (internal quotation marks omitted).

[79] *See Piansiaksone*, 954 P.2d at 868; *see also State v. Ball*, 685 P.2d 1055, 1060 (Utah 1984) ("The criminal defendant's right to a fair trial does not create a license in his defense counsel to conduct an inquisition into the private beliefs and experiences of a venireman.").

[80] *Taylor*, 2007 UT 12, ¶ 70 (internal quotation marks omitted).

or child worked for a similar entity, and where each juror was born. Instead, Mr. Reece argues that the court improperly limited his questions to the jurors' and their spouses' general occupations without requiring them to report specific employers.[81]

¶48 But Mr. Reece's argument ignores a number of questions the court permitted that were directly related to the jurors' attitudes towards law enforcement and the justice system. For example, questions 48 through 62 required jurors to report whether they or someone close to them had ever been arrested or charged with a crime, and whether that experience had generated any negative feelings toward the justice system. Questions 63 through 78 asked whether the juror or family members had been the victim of a crime, and if so, how it affected their feelings toward the justice system. Mr. Reece was also allowed to ask how jurors felt about defense attorneys and prosecutors, whether jurors believed police officers were more credible than other potential witnesses, and whether they felt that the justice system is generally too hard or too soft on criminals. Moreover, the trial court permitted Mr. Reece to ask individual follow-up questions with each prospective juror, and the record shows that he elicited even more information that allowed him to assess jurors' attitudes about the criminal justice system and biases towards law enforcement.[82]

¶49 Second, even though the trial court allowed questions requiring jurors to disclose their membership in any social organizations, Mr. Reece contends that the court improperly excluded a question that would have required jurors to list any positions they had held within those organizations. According to Mr. Reece, "[i]nformation about positions can provide insight about the level of involvement in and commitment to the organization." That may be true, but the court allowed several other questions that, coupled with individual follow-up questioning, adequately

---

[81] The trial court permitted Mr. Reece to inquire about each juror's birthplace.

[82] For example, Mr. Reece questioned one potential juror who indicated on his questionnaire that defense attorneys "serve a noble cause but at times" he "question[s] their ethics." Mr. Reece was able to determine that the juror had no "similar concerns about the ethics of prosecutors" and that his parents taught him that "you can trust a police officer" because they are generally "good people." The record is replete with similar examples.

addressed potential biases and attitudes derived from membership in a particular social or political group. Question 125 asked jurors whether they felt their decision in the case "might be criticized by your family, your friends, your church or church members, or others," and if so, "would such criticism be of concern to you?" Additionally, Mr. Reece asked jurors to describe their political views, whether they were involved in any groups organized to make changes to the justice system, and he was also permitted to follow up individually on any answers to these questions that raised a concern.

¶50 Third, Mr. Reece asked whether each juror or the juror's "sibling, spouse, children, [or] parents" had "ever worked for an attorney," but the court did not permit him to require jurors to identify the family member's name, the juror's relationship to that person, the attorney's name, or the name and location of the law firm or government agency that employed the attorney." Mr. Reece maintains that striking these questions prevented him from determining "whether jurors would have been unsuitable for the defense based on their connection to people employed in the legal community." But the record indicates that Mr. Reece was able to elicit much of this information in follow-up questions with individual jurors. For example, Mr. Reece's trial counsel asked individual follow-up questions of one juror who indicated on her questionnaire that she "had family and friends that work with attorneys." The juror said she had "a daughter who is an attorney," counsel asked "what kind of attorney is she," and the juror said her daughter worked "for LexisNexis and just teaches at colleges." A second juror indicated that his father "was a criminal lawyer, . . . a defense attorney" in response to a follow-up question, and Mr. Reece learned that a third juror had a "father-in-law [who] does water rights." There is no indication in the record that the court limited Mr. Reece's follow-up questioning in a way that prevented him from determining whether the jurors had relationships with people in the legal community that would lead them to favor the defense or the prosecution.

¶51 Finally, Mr. Reece argues that the trial court should have allowed him to ask whether each juror, or "any close friend or family member, had a substance abuse problem. If so, who was the person, when did the problem occur, and what substance was it?" Instead, the court asked each juror whether the fact that a witness used drugs would "impact your ability to be fully impartial and fair." Only one juror answered that question affirmatively, and the court eventually dismissed her for health reasons. Mr. Reece cites our decision in *State*

*v. Saunders*[83] for the proposition that it is reversible error for a trial court to allow jurors to essentially self-report their own biases—that is, to simply ask whether a particular factor would impair the juror's objectivity and then take their "answer as dispositive of the issue of bias." We conclude that *Saunders* is distinguishable from the circumstances in Mr. Reece's case and that the trial court did not abuse its discretion in limiting questions about substance abuse.

¶52 In *Saunders*, we reversed a trial court's decision refusing defense counsel's request to ask follow-up questions of several potential jurors "who stated they had specialized knowledge concerning child sexual abuse from their educational background and one juror who was actively supporting an anti-child-abuse organization."[84] We expressed disapproval of "the all too prevalent practice of avoiding any real inquiry into possible bias" by simply asking prospective jurors if they "could decide the case fairly and follow the law . . . then taking a prospective juror's affirmative answer as dispositive of the issue of bias."[85] Because the jurors' "answers provide[d] evidence of possible bias" about child sex abuse, we concluded that a juror's "conclusory statement that he or she will . . . decide the case fairly"[86] was simply insufficient and that the court abused its discretion "in refusing to allow a further probing of the jurors' attitudes toward child sexual abuse."[87] In doing so, we noted that there was "little objective evidence" of the defendant's guilt and the jurors "therefore had to rely on a subjective evaluation of the witnesses' credibility that would be strongly influenced by the jurors' own experiences and points of view and the possible biases that arose from them."[88]

¶53 Here, although we acknowledge the court could have crafted a more effective question to probe the jurors' attitudes about substance abuse, the circumstances differ in important respects from those in *Saunders*. To begin with, the bias Mr. Reece identifies is not directly related to the offenses for which he was convicted. *Saunders* involved multiple sex offenses committed against a small child, and

---

[83] 1999 UT 59, ¶ 34, 992 P.2d 951.

[84] *Id.* ¶¶ 38–39.

[85] *Id.* ¶ 34.

[86] *Id.* ¶ 36.

[87] *Id.* ¶ 47.

[88] *Id.* ¶ 37.

several jurors revealed information during voir dire that fairly called into question their ability to remain impartial due to the nature of the offenses.[89] Mr. Reece, by contrast, was not charged with any drug offenses, and there were witnesses for both the prosecution and the defense who admitted to having substance abuse problems. Consequently, a bias against drug users would not necessarily have predisposed a juror to find against Mr. Reece. Moreover, unlike the defendant in *Saunders*, Mr. Reece was permitted to ask follow-up questions of each individual juror without any restrictions.[90] Mr. Reece has not identified any instances in which the trial court prevented him from asking a specific follow-up question, and our own review of the record indicates that the judge gave him wide latitude in questioning each individual juror.[91]

¶54 Furthermore, asking jurors to disclose their own personal history with substance abuse—including any family member's drug use—is deeply personal. As we have noted, judges have "broad discretionary power to conduct voir dire" and have "a duty to protect juror privacy."[92] Judges therefore do not abuse their discretion when they take steps to assure that any line of questioning is "pursued with a sensitivity to the privacy of the potential juror"[93] so long as "the totality of the questioning" affords counsel with "an adequate opportunity to gain information necessary to evaluate the jurors."[94] Of course, protecting the jurors' privacy becomes a less compelling reason to limit voir dire questioning when a potential bias is strongly related to elements of the charged offense or other

---

[89] *Id.* ¶¶ 4, 38.

[90] *See id.* ¶¶ 38–39.

[91] We also note that Mr. Reece's follow-up questions actually elicited information about jurors' attitudes towards substance abuse. For example, in questioning one juror who indicated on her questionnaire that a relative had been charged with a crime, Mr. Reece was able to learn that the relative was convicted of a drug offense. Mr. Reece's counsel specifically asked if there was "anything about your brother-in-law's situation that somehow is going to influence your ability" to objectively evaluate witness's testimony, and the juror said no.

[92] *State v. Ball*, 685 P.2d 1055, 1060 (Utah 1984).

[93] *Id.*

[94] *Piansiaksone*, 954 P.2d at 868 (internal quotation marks omitted).

important issues in the case. But as we have explained, that is not the case here. Consequently, due to the highly personal nature of this particular question, the wide latitude the judge provided for individual follow-up questioning, and the attenuated relationship between the alleged bias and the ultimate issues in the case, we cannot say that the trial court abused its discretion in this instance.

¶55 In summary, the trial court allowed Mr. Reece to ask the vast majority of the 193 questions in his proposed juror questionnaire. Those questions, along with those the court modified and the unlimited individual follow-up questioning, demonstrate that Mr. Reece had every opportunity to uncover the information he needed to identify juror biases and intelligently exercise his peremptory challenges. Far from placing unreasonable limits on the scope of voir dire, the trial court was fair and accommodating and appropriately exercised its discretion to protect the jurors' privacy without inhibiting Mr. Reece's ability to meaningfully evaluate the prospective jurors.

### III. The Trial Court Properly Admitted the State's Rule 404(b) Evidence

¶56 Mr. Reece also argues that rule 404(b) of the Utah Rules of Evidence should have barred the admission of evidence that police found a stolen assault rifle in his car when they arrested him. And he contends that the court should have excluded certain details of the traffic stop and arrest that led to the weapon's recovery. Specifically, police thought they saw Mr. Reece reach for a handgun under his seat, and after he was ordered out of the car, Mr. Reece ran and had to be subdued by a taser. Rule 404(b) prohibits the admission of evidence of a defendant's "crime, wrong, or other act . . . to prove [the defendant's] character in order to show on a particular occasion the [defendant] acted in conformity with the character."[95] Mr. Reece contends that the "true purpose" of the stolen rifle evidence was "to suggest that Mr. Reece was a dangerous person who acted in conformity with [his] alleged bad character."

¶57 Rule 404(b) allows evidence of prior bad acts for noncharacter purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."[96] But the evidence "must clear several evidentiary

---

[95] UTAH R. EVID. 404(b)(1).

[96] *Id.* 404(b)(2).

hurdles before admission—rules 404(b), 402, and 403."[97] These requirements can be distilled into a three-part test: the prior bad-act evidence (1) must be "offered for a genuine, noncharacter purpose," (2) "must be relevant" to that noncharacter purpose, and (3) the "probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice."[98] Additionally, as we recently clarified in *State v. Lucero*, "matters of conditional relevance must also meet the preponderance of the evidence standard under" rule 104(b).[99] We conclude that the stolen rifle evidence meets each of these requirements.

*A. The Evidence Was Offered For a Genuine Noncharacter Purpose*

¶58 Evidence that Mr. Reece had a stolen assault rifle was offered for the noncharacter purpose of identifying Mr. Reece as the murderer by showing that he had access to the type of gun investigators determined was likely the murder weapon. A State firearms expert matched the broken guide rod found in the victim's home to a 9 mm Beretta 90-Two handgun, and the owner of the stolen rifle testified that the weapon was stolen with a Beretta 90-Two from his truck in January 2010. Mr. Reece testified at trial that he did not have a gun the day of the murder and that he saw someone else in the victim's home with a gun right after she was killed. He also testified that he did not own a Beretta handgun and claimed that Friend was lying when she testified that she saw him cleaning a Beretta the day before the murder. In other words, Mr. Reece claimed that he could not have committed the murder because he did not even have access to a Beretta when the victim was killed. Because police never recovered the murder weapon, there was no physical evidence to rebut that claim. Consequently, the central issue at trial was the identity of the killer. And evidence linking Mr. Reece to a Beretta undermined his assertion that someone else killed the victim by showing that, contrary to his trial testimony, Mr. Reece had access to the type of gun that investigators had identified as the likely murder weapon. The stolen rifle evidence was therefore offered for the genuine noncharacter purpose of establishing Mr. Reece's identity as the murderer.

¶59 Mr. Reece maintains that even if the evidence was offered to prove his identity as the murderer, "[t]o qualify as identity evidence,

---

[97] *State v. Lucero*, 2014 UT 15, ¶ 13, 328 P.3d 841.

[98] *Id.*

[99] *Id.*

. . . the link between the evidence and the charged offense must be so unique as to constitute a signature." He cites a number of cases where courts admitted evidence of a defendant's prior crimes under rule 404(b) because the prior crimes bore "numerous . . . signature-like similarities" with the charged offense. Mr. Reece's argument is inconsistent, however, with the plain language of rule 404(b) and our caselaw.

¶60 It is true that cases where rule 404(b) evidence is offered to prove identity often involve signature crimes.[100] But the language of rule 404(b) does not limit identity evidence in such a manner and neither does our caselaw. Rule 404(b)(2) provides that evidence of prior bad acts "may be admissible" to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."[101] We have recognized that the permissible uses of bad-acts evidence listed in rule 404(b) is illustrative, "not exhaustive," and "evidence demonstrating other purposes is not precluded so long as the evidence is offered for a legitimate purpose other than to show the defendant's propensity to commit the crime charged."[102] We see no reason why the language of the rule requires the exclusion of evidence that, though probative of identity, does not involve a signature crime.

¶61 Our caselaw is also inconsistent with such a limitation. In *State v. Shaffer*, we affirmed a trial court's decision in a murder trial to admit evidence that the defendant stole a wallet.[103] We noted that after the wallet was stolen, the owner's identification was used to

---

[100] *See, e.g., State v. Decorso*, 1999 UT 57, ¶¶ 27, 31, 993 P.2d 837 (admitting evidence that the defendant burglarized a shoe store in West Jordan because there "were numerous similarities between the crimes committed at" that store and another store in Draper, "suggesting that the same person committed both crimes"); *State v. Webster*, 2001 UT App 238, ¶ 35, 32 P.3d 976 (concluding that evidence that a defendant stole a car in another state was inadmissible because "[t]he only similarities apparent on the record between the two incidents are that (1) a car was stolen (2) from a dealership lot" and this "pair of facts is not sufficiently unique as to constitute a signature" (internal quotation marks omitted)).

[101] UTAH R. EVID. 404(b)(2).

[102] *State v. Allen*, 2005 UT 11, ¶ 17, 108 P.3d 730.

[103] *State v. Shaffer*, 725 P.2d 1301, 1308 (Utah 1986).

obtain a gun permit and purchase a .38 caliber weapon that was used to kill the victim.[104] Because the "theft of [the] identification provided the first link in the chain of evidence that connected the .38 caliber weapon . . . with the defendant and the [victim's] death," we concluded that the theft was "relevant to establishing the identity of the defendant as the person in possession" of the murder weapon.[105]

¶62 Similarly, in *Salt Lake City v. Alires*, the Utah Court of Appeals determined that a trial court properly admitted evidence that the defendant had tried to break into the victim's home in a prosecution for telephone harassment.[106] The police had responded to a 911 call and found the defendant "banging on a window" at the back of the victim's apartment.[107] The defendant told the police that he lived in the apartment and was trying to get in to see his girlfriend and baby.[108] After confirming that the defendant did not live there and that the victim did not want to see him, the police asked him to leave.[109] One hour later, someone called the victim, asked her why she had called the police, and threatened to kill her daughter if she did not let him see her.[110] Even though the attempted break-in did not involve "a common plan or scheme"[111] similar to the threatening phone call, the court of appeals concluded that the incident was admissible as identity evidence under rule 404(b) because "the facts clearly link the two incidents and tend to identify [the] defendant as the caller."[112]

¶63 These cases demonstrate that evidence of a prior crime offered to identify a defendant need not bear "signature-like" similarities with the charged offense to be admissible under rule 404(b). Rather, any evidence that is probative of identity for reasons other than establishing a propensity for criminal activity may be admitted under the rule, provided of course that it also clears other

---

[104] *Id.*

[105] *Id.*

[106] 2000 UT App 244, ¶¶ 2–6, 12–13, 9 P.3d 769.

[107] *Id.* ¶ 2.

[108] *Id.*

[109] *Id.*

[110] *Id.* ¶¶ 3–4.

[111] *Id.* ¶ 13.

[112] *Id.*

pertinent evidentiary hurdles.[113] And here, as we have discussed, the stolen rifle evidence was offered for just such a purpose.

### B. The Evidence is Relevant to Identify Mr. Reece as the Murderer

¶64 Having concluded that the stolen rifle evidence was offered for the noncharacter purpose of identifying Mr. Reece as the murderer, we now examine whether the evidence is relevant to that purpose. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would without the evidence; and (b) the fact is of consequence in determining the action."[114] This is not a particularly high bar to clear—we have previously stated that any "[e]vidence that has even the slightest probative value" is relevant under the rules of evidence.[115] But that is not the entire inquiry—when the relevancy of a prior crime or bad act hinges on "whether a fact exists,"[116] the prior act is only admissible if the trial court determines that "the jury could reasonably find" that factual condition fulfilled "by a preponderance of the evidence."[117]

¶65 Here, Mr. Reece's access to a 90-Two Beretta has no bearing on the identity of the murderer unless such a weapon was actually used to kill the victim. The relevancy issue in this case therefore presents us with two questions: (1) Does possession of the stolen rifle

---

[113] Other courts have reached the same conclusion. *See, e.g.*, *United States v. Treff*, 924 F.2d 975, 981–82 (10th Cir. 1991) (concluding that evidence that the defendant killed his wife and fled with his children was relevant to establish the defendant's identity as the arsonist of another home); *State v. Gillispie*, 26 A.3d 397, 413 (N.J. 2011) (noting that rule 404(b) "is not so narrow with respect to proof of identity" to preclude evidence that the defendant had used the murder weapon in a subsequent crime from admission in his murder trial even though the later crime was not similar in any way to the murder); *State v. Suttle*, 812 P.2d 119, 124 n.10 (Wash. Ct. App. 1991) (noting that "prior bad acts evidence may be admitted under [rule] 404(b) when that evidence is probative of identity for other reasons, and its admissibility is not limited to signature crimes" (internal quotation marks omitted)).

[114] UTAH R. EVID. 401.

[115] *State v. Jaeger*, 1999 UT 1, ¶ 12, 973 P.2d 404 (alteration in original) (internal quotation marks omitted).

[116] UTAH R. EVID. 104(b).

[117] *Lucero*, 2014 UT 15, ¶ 19 (internal quotation marks omitted).

make it more likely that Mr. Reece possessed a Beretta 90-Two handgun the day of the murder? (2) Could a reasonable jury have found by a preponderance of the evidence that the murder weapon was in fact a Beretta 90-Two? We consider each question in turn and conclude that the stolen rifle evidence was relevant to establishing Mr. Reece's identity as the murderer.

¶66 First, Mr. Reece's possession of the stolen rifle has at least some "tendency" to make it more probable that he had access to a Beretta 90-Two handgun. Investigators testified that the serial number of the stolen rifle found in Mr. Reece's car matched a weapon that was stolen in Park City six months before the murder. And the rifle's owner testified that it was stolen along with "a Beretta 90-Two 9 mm pistol." It is certainly possible, as Mr. Reece points out, that he purchased the stolen rifle from someone else and that the Beretta found its way to another black-market purchaser. But Mr. Reece's possession of the stolen rifle also raises a nontrivial possibility that he stole both weapons himself or purchased them at the same time from the person who did. Even if the probability of either scenario is somewhat remote, evidence that "has *any* tendency" to make a fact of consequence more or less probable is relevant and admissible.[118]

¶67 Second, there is enough evidence in the record to justify a jury finding by a preponderance of the evidence that the murder weapon was in fact a 9 mm Beretta 90-Two. Mr. Reece admitted that he owned a Beretta six months before the murder occurred, another witness testified that she saw Mr. Reece cleaning a Beretta the day before the murder, and the victim's blood was found on Mr. Reece's shirt. Additionally, the police found a 9 mm shell casing at the crime scene, a firearms expert testified that the broken guide rod police recovered is "a patented piece that's used exclusively by Beretta," and the expert also testified that the broken guide rod "matched the one" used in a Beretta 90-Two.

¶68 Mr. Reece argues that "the State's proof was far from conclusive." He points out that the State's expert "conceded that at least two other Berettas—the 92A1 and the 96A1—use the same guide rod." But the expert also testified that the 96A1 was a .40 caliber weapon, not a 9 mm. The expert testimony and the physical evidence therefore indicated that the murder weapon was either a 9 mm Beretta 90-Two or a 92A1, and the expert affirmatively matched the guide rod to the 90-Two model. A jury could therefore find by a

---

[118] UTAH R. EVID. 401, 402 (emphasis added).

preponderance of the evidence that the murder weapon was a Beretta 90-Two. And because it would not be unreasonable for the jury to reach such a conclusion, evidence linking Mr. Reece to a Beretta 90-Two is relevant to the noncharacter purpose of identifying him as the murderer.

### C. The Evidence Was Not Unfairly Prejudicial

¶69 "[T]he final hurdle that prior bad acts evidence must overcome" is rule 403,[119] which provides that courts "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."[120] And "unfair prejudice results only where the evidence has an undue tendency to suggest decision upon an improper basis."[121] Weighing the probative value and potentially unfair prejudicial effect of evidence involves a variety of considerations, including the factors we identified in *State v. Shickles*.[122] These factors are

> the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility.[123]

We recently clarified that "while some of these factors may be helpful in assessing the probative value of the evidence in one context, they may not be helpful in another."[124] So it is "unnecessary for courts to evaluate each and every factor and balance them together in making their assessment."[125] Accordingly, in determining the admissibility of the stolen rifle evidence under rule 403, we focus our analysis on the text of rule 403 and analyze only those *Shickles* factors that are relevant to the circumstances of Mr. Reece's case. We

---

[119] *Lucero*, 2014 UT 15, ¶ 30.

[120] UTAH R. EVID. 403.

[121] *Lucero*, 2014 UT 15, ¶ 32 (internal quotation marks omitted).

[122] 760 P.2d 291, 295–96 (Utah 1988), *abrogated on other grounds by State v. Doporto*, 935 P.2d 484 (Utah 1997).

[123] *Id.* (internal quotation marks omitted).

[124] *Lucero*, 2014 UT 15, ¶ 32.

[125] *Id.*

conclude that the probative value of the evidence was not substantially outweighed by the potential for unfair prejudice.

¶70 The probative value of the stolen rifle was perhaps not strong, but it was also not insubstantial. The police never recovered the murder weapon, and Mr. Reece testified at trial that he did not have a gun the day of the murder. He also claimed that he had gotten rid of the only Beretta he ever owned in early 2010 and that someone else committed the murder. So even though the State had DNA evidence that conclusively linked Mr. Reece to the crime, it also needed the stolen rifle evidence to effectively rebut Mr. Reece's claim that he did not have access to the type of weapon used to kill the victim. Of course, there was no evidence that Mr. Reece himself stole the rifle or that he purchased the rifle with a stolen Beretta, so the link between Mr. Reece's possession of the stolen rifle and access to the murder weapon was somewhat attenuated. Additionally, the State's expert left open the possibility that the murder weapon was a Beretta 92A-1, not a 90-Two.[126]

¶71 But even though the evidence's probative value was not overwhelming, the potential for unfair prejudice is quite low considering the other unlawful behavior Mr. Reece admitted to on the witness stand. He testified that he was in the victim's neighborhood stealing mail after several days of heavy drug use. He admitted that he entered several homes without permission and violently assaulted one of the residents he encountered without provocation. And he also told the jury that during his crime spree, he hit another car, sped off, and had to be tackled by several neighbors before police arrived. The fact that Mr. Reece also had a stolen rifle in his car, fled the police, and had to be subdued by a taser certainly did not cast him in a positive light, but considering the variety and severity of the criminal conduct Mr. Reece admitted to at trial, it simply would not have roused the jury "to overmastering hostility."[127]

¶72 In summary, we conclude that the stolen rifle evidence was not improperly admitted under rule 404(b). The evidence was offered for the genuine noncharacter purpose of identifying Mr. Reece as the murderer by showing he had access to the type of gun investigators believed to be the murder weapon. And the fact that the rifle in his possession was stolen with a 90-Two Beretta has

---

[126] *Supra* ¶ 68.

[127] *See Lucero*, 2014 UT 15, ¶ 33.

at least some tendency to show that Mr. Reece had access to that type of weapon. Additionally, the State presented enough evidence to justify a jury finding by a preponderance of the evidence that the murder weapon was in fact a 90-Two Beretta. Finally, the potential for unfair prejudice did not substantially outweigh the evidence's probative value in light of the criminal conduct that Mr. Reece freely admitted to in front of the jury.

### IV. The Trial Court Did Not Abuse its Discretion by Denying the Motion to Sever

¶73 Mr. Reece next argues that the trial court erred by refusing to sever the third count in the indictment—possession of a firearm by a restricted person—from the other charges. Utah Code section 77-8a-1(4)(a) provides that a "court shall order an election of separate trials of separate counts" if the court determines that "a defendant . . . is prejudiced by a joinder of offenses." "The burden of demonstrating prejudice is a difficult one, and the ruling of the trial judge will rarely be disturbed upon review. The defendant must show something more than the fact that a separate trial might offer him a better chance of acquittal."[128]

¶74 Here, instead of completely severing the weapons charge, the court elected to bifurcate it, instructing the jury to determine if Mr. Reece intentionally possessed a firearm on July 13. The jury found beyond a reasonable doubt that Mr. Reece possessed a weapon, and then in a separate proceeding before the judge,[129] the State introduced evidence of Mr. Reece's prior felony conviction. Mr. Reece argues that the court's decision "did not comply with the rules of evidence or [his] constitutional right to due process and a fair trial" because the jury was "encouraged . . . to speculate about what circumstances made . . . possession" of the firearm "illegal." In support, he cites *State v. Saunders*[130] and *State v. Long*[131] for the proposition that severance is always required on a possession by a

---

[128] *State v. Smith*, 927 P.2d 649, 654 (Utah Ct. App. 1996) (internal quotation marks omitted); *see also State v. Benson*, 2014 UT App 92, ¶ 16, 325 P.3d 855.

[129] Mr. Reece waived his right to a jury trial on the restricted person element of the weapons charge.

[130] 699 P.2d 738 (Utah 1985), *abrogated on other grounds by State v. Doporto*, 935 P.2d 484 (Utah 1997).

[131] 721 P.2d 483 (Utah 1986).

restricted person charge when evidence of the defendant's legal disability "would have been inadmissible at a separate trial" on the other charges. We conclude that refusing to sever the weapons offense was not an abuse of discretion.

¶75 In *Saunders*, the jury was presented with evidence that the defendant was a convicted felon in a trial for possession of a weapon by a restricted person, burglary, and theft.[132] We reversed his convictions because evidence of the prior conviction "permit[ted] the jury to consider evidence of [the] defendant's prior crime as the basis for an inference that he committed the burglary and theft."[133] And in *Long*, we noted that the "refusal to sever the possession of a dangerous weapon charge from the remaining charges was an abuse of discretion because of the unwarranted prejudice inherent in informing the jury that a defendant is a convicted felon."[134] The jurors in Mr. Reece's case, by contrast, never saw evidence of Mr. Reece's prior criminal history. Rather, the court instructed the jury that it is "unlawful under certain circumstances for a person to purchase, transfer, possess, use, or have under his control or custody a firearm." The jurors may have wondered what "circumstances" made Mr. Reece's possession of a firearm illegal, and some of them may have speculated that Mr. Reece had a prior criminal history. But it is equally plausible that the jurors believed that the possession instruction related to the other charges—for instance, committing burglary with a dangerous weapon is a different offense than simple burglary. Mr. Reece has therefore failed to meet his heavy burden of demonstrating that the court abused its discretion by refusing to sever the weapons charge.

## V. The Aggravated Murder Sentencing Statute is Not Unconstitutional, but Mr. Reece is Entitled to a New Hearing

¶76 Finally, Mr. Reece argues in the alternative that the noncapital aggravated murder sentencing statute is unconstitutional. Because his arguments mirror those we recently rejected in *State v. Perea*,[135] we conclude that the statute is constitutional. Mr. Reece also argues that the trial court abused its discretion when it sentenced him to life without parole (LWOP) because it incorrectly interpreted the sentencing statute as imposing a presumptive LWOP sentence.

---

[132] 699 P.2d at 740–41.

[133] *Id.* at 741.

[134] 721 P.2d at 495.

[135] 2013 UT 68, ¶¶ 110–25, 322 P.3d 624.

Although there is some evidence that the court properly weighed the pertinent sentencing factors, we remand for a limited hearing to determine whether, and if so, how the court's erroneous interpretation of the statute affected the decision to impose an LWOP sentence.

### A. The Sentencing Statute is Constitutional

¶77 The aggravated murder sentencing statute provides that a sentence of first degree felony aggravated murder "shall be life in prison without parole or an indeterminate prison term of not less than 25 years and which may be for life."[136] Mr. Reece contends that the sentencing statute is unconstitutional for three reasons: (1) the statute "is unconstitutionally vague because, unlike Utah's other LWOP statutes, it provides no guidance for when to impose LWOP"; (2) the statute violates Utah's constitutional guarantee "that the operation of the law be uniform"; and (3) the statute violates the "federal and state constitutions' guarantee that cruel and unusual punishments shall not be inflicted" as well as Utah's "unnecessary rigor" clause. We rejected each of these arguments in *State v. Perea*, and we reject them again here.

¶78 In *Perea*, the defendant argued that the aggravated murder sentencing statute was "unconstitutionally vague,"[137] because "it does not specify the particular items the sentencing court must consider in deciding which of the two possible sentences to impose."[138] We concluded that the statute is constitutional. We observed that the statute must be read in the context of other provisions mandating that the criminal code "shall be construed . . . [to p]revent arbitrary and oppressive treatment" and to impose "penalties which are proportionate to the seriousness of offenses."[139] Consequently, we concluded that before a sentencing court imposes an LWOP sentence, it must "consider all the evidence before it—the totality of the circumstances—[and impose] a sentence that is proportionate to the crime and the culpability of the defendant."[140] Mr. Reece's vagueness challenge is no different than the argument we rejected in *Perea*—he maintains that the statute is

---

[136] UTAH CODE § 76-3-207.7(2).

[137] 2013 UT 68, ¶ 110.

[138] *Id.* ¶ 115.

[139] *Id.* (alterations in original) (internal quotation marks omitted).

[140] *Id.*

unconstitutional because it "provides no guidance on when to impose" LWOP instead of a sentence of twenty-five years to life in prison. Accordingly, we reject the vagueness challenge on stare decisis grounds.

¶79 Our decision in *Perea* also rejected the defendant's argument that the sentencing statute "violates the uniform operation of laws provision of the Utah Constitution."[141] We observed that "[n]ot all those found guilty of aggravated murder are similarly situated" because "each case and each defendant presents a different set of facts and a different combination of aggravating and mitigating factors."[142] And "because the discretion given to district courts" to weigh those factors "furthers the legitimate legislative purpose of sentencing offenders based on the severity of their particular circumstances," we concluded that the sentencing statute "does not violate [the] uniform operation of laws provision."[143] Mr. Reece similarly argues that the sentencing statute runs afoul of the uniform operation of laws provision "because it divides a class of similarly situated offenders into two subclasses who will receive disparate treatment but defines no reasonable objective with which to differentiate the subclasses." Our analysis in *Perea* speaks directly to that issue, and we see no reason to revisit it.

¶80 Finally, the defendant in *Perea* also unsuccessfully challenged the sentencing statute under the unnecessary rigor provision of the Utah Constitution and the cruel and unusual punishment provision of the United States Constitution. We rejected the unnecessary rigor challenge because that provision "applies only to the conditions of one's confinement and does not speak to the proportionality of the particular sentence imposed," so the provision was "not implicated by the imposition of" an LWOP sentence.[144] And we determined that the cruel and unusual punishment challenge was meritless because the defendant was an adult, did not face the death penalty, and did not commit a non-homicide crime, so none of the United States Supreme Court precedent the defendant cited demonstrated that an LWOP sentence violated the Eighth

---

[141] *Id.* ¶ 121.

[142] *Id.* ¶ 123.

[143] *Id.*

[144] *Id.* ¶ 124.

Amendment.[145] Here, Mr. Reece argues that the sentencing statute violates the Eighth and Fourteenth Amendments of the federal constitution because "the statute leaves the LWOP decision to the unfettered discretion of the judge, thereby allowing LWOP to be imposed in an arbitrary and capricious manner." But like the defendant in *Perea*, Mr. Reece cites only to death-penalty cases, and he does not identify any compelling factual circumstances that make LWOP an excessively harsh sentence in this case. Thus, just as with Mr. Reece's other constitutional challenges, *Perea* is directly on point, and Mr. Reece has not raised any compelling reason why we should revisit any of our conclusions in that case. Accordingly, we conclude that the aggravated murder sentencing statute is constitutional.

### B. We Remand for the Court to Determine Whether, and if so, How Its Incorrect Reading of the Sentencing Statute Affected Its Sentencing Decision

¶81 Mr. Reece maintains that even if the sentencing statute is constitutional, the court abused its discretion in sentencing him to LWOP because its decision resulted from "the incorrect belief that LWOP was the presumptive sentence" and because the court based its decision on "irrelevant and unreliable information" without considering Mr. Reece's potential for rehabilitation. "We afford the trial court wide latitude in sentencing and, generally, will reverse a trial court's sentencing decision only if it is an abuse of the judge's discretion."[146] Additionally, we have held that the due process clause of the Utah Constitution "requires that a sentencing judge act on reasonably reliable and relevant information in exercising discretion in fixing a sentence."[147]

¶82 Our review of the court's post-sentence ruling on Mr. Reece's constitutional challenges confirms that the court

---

[145] *Id.* ¶ 125 (citing *Roper v. Simmons*, 543 U.S. 551, 574 (2005) (holding that juveniles cannot be sentenced to death); *Graham v. Florida*, 560 U.S. 48, 75 (2010) (concluding that the Eighth Amendment prohibits an LWOP sentence for juvenile defendants who did not commit a homicide); *Atkins v. Virginia*, 536 U.S. 304, 318 (2002) (holding that defendants with an IQ below 70 cannot receive capital punishment)).

[146] *State v. Bluff*, 2002 UT 66, ¶ 66, 52 P.3d 1210 (internal quotation marks omitted).

[147] *State v. Howell*, 707 P.2d 115, 118 (Utah 1985).

determined, at some point, that LWOP was the presumptive sentence. But it is not clear whether the court reached that conclusion before or after it imposed Mr. Reece's sentence. In the trial court, Mr. Reece argued that the sentencing statute was unconstitutional because it "does not allow a jury to decide a sentence in a first degree felony aggravated murder case." He cited *Apprendi v. New Jersey*, where the Supreme Court held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."[148] Relying on *Apprendi*, the trial court rejected Mr. Reece's constitutional challenge in a post-trial ruling. The court concluded that because "the language of the statute sets forth the *presumption* that the sentence of aggravated murder *shall be life without parole*," any additional fact finding would reduce Mr. Reece's sentence rather than increase it, so "the holding in *Apprendi* does not apply."

¶83  The State concedes that this was an incorrect interpretation of the statute, and we agree.[149] But the State insists that "[n]othing in the court's sentencing analysis or decision demonstrates or even implies that the court's mistaken interpretation influenced its decision to impose LWOP." In support, the State points out that the court never indicated at the sentencing hearing that LWOP was the presumptive sentence and the court explicitly stated that the "two options here are 25 [years] to life or life without parole." It was not until the court's post-trial ruling—which was issued after the imposition of Mr. Reece's sentence—that the court incorrectly interpreted the sentencing statute in addressing Mr. Reece's *Apprendi* argument.

¶84 The record is simply inconclusive on this point. At the sentencing hearing, the trial court observed that Mr. Reece did "well in school as a young man" and had "two girls" in his life that he loves—a girlfriend and a daughter. But the court ultimately determined that based on the violent nature of the crime and Mr. Reece's history of violence, "the only way to protect people" was "to give [Mr. Reece] life without parole." On its face, the court's analysis appears sound—it "considered the totality of the circumstances and

---

[148] 530 U.S. 466, 490 (2000).

[149] The aggravated murder sentencing statute *does not* create a presumption in favor of imposing LWOP. The statute provides, "The sentence [for first degree felony aggravated murder] shall be life in prison without parole or an indeterminate prison term of not less than 25 years and which may be for life." UTAH CODE § 76-3-207.7(2).

explicitly weighed the mitigating and aggravating factors."[150] But the court's post-trial ruling, which was issued just eight days later, states that LWOP was the presumptive sentence. It is therefore unclear whether the court analyzed the pertinent sentencing factors to choose between LWOP and twenty-five years to life, or whether it analyzed the factors to determine whether the circumstances justified a departure from an incorrectly presumed LWOP sentence. Consequently, we remand this question to the trial court. On remand, the court should determine whether its incorrect reading of the sentencing statute affected its decision to impose LWOP. If so, then Mr. Reece's sentence on the aggravated murder charge must be vacated, and the court must hold a new sentencing hearing.

## Conclusion

¶85 We affirm Mr. Reece's convictions. The failure to issue several lesser included offense instructions was harmless error, the court did not abuse its discretion in limiting voir dire questioning, the stolen rifle evidence was properly admitted under rule 404(b), and the court did not exceed its discretion by denying Mr. Reece's motion to sever the weapons charge. We also reject Mr. Reece's constitutional challenges to the aggravated murder sentencing statute because his arguments mirror those we rejected in *State v. Perea*. But we agree with Mr. Reece that the trial court incorrectly interpreted the sentencing statute as imposing a presumptive LWOP sentence. We accordingly remand for the court to determine whether its incorrect reading of the statute affected its decision to impose LWOP. On remand, if the court determines that its sentencing decision was affected by an erroneous reading of the statute, Mr. Reece is entitled to a new sentencing hearing.

_____

[150] *See Perea*, 2013 UT 68, ¶ 119.